UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

VIPAN CHANDER,

               Petitioner,           **MEMORANDUM & ORDER**
                                            17—CV-5919(EK)(LB)

        -against-

WILLIAM LEE,

               Respondent.

------------------------------------x

ERIC KOMITEE, United States District Judge:

        Petitioner Vipan Chander seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  After an extended crime spree in September 2009, Chander was convicted in Queens County Supreme Court of first-degree burglary, third-degree arson, seven counts of second-degree assault, one count of attempted assault in the first degree, two counts of reckless endangerment, two counts of weapons possession, two counts of driving while intoxicated, and one count of resisting arrest.  In August 2012, Chander was sentenced to thirty to thirty-five years in prison; this term was reduced moderately on direct appeal, as noted below.  He remains incarcerated at the Eastern New York Correctional Facility in Ulster County, New York.

        Petitioner raises nine (sometimes overlapping) arguments in his petition, which are organized into seven claims here for ease of discussion: *First,* he contends that the

evidence at trial was legally insufficient to support his convictions because his intoxication precluded him from forming the requisite intent.[1] *Second,* Chander contends that his trial counsel was constitutionally ineffective for failing to call an expert witness to support his intoxication defense. *Third*, he contends that the trial court violated his due process rights by conveying defective instructions to the jury. *Fourth*, Chander contends that the trial court violated his due process rights by erroneously admitting into evidence recordings of 911 calls and a photograph of a bloody towel. *Fifth*, he contends that the State violated its *Brady* obligations by failing to produce a video recording of him at the hospital after his arrest. *Sixth*, Chander contends that the trial court should have suppressed (under the Fourth Amendment) certain physical evidence that the State introduced. *Seventh*, he argues that the time that elapsed between his arrest and trial violated his Sixth Amendment right to a speedy trial.

Because Chander's arguments are procedurally defaulted, without merit, or both, as described below, his petition is denied.

_____

[1] He also contends — with respect to the burglary charge specifically — that the evidence was legally insufficient evidence to show that he entered the premises at issue unlawfully or, indeed, at all.  Pet. 26, ECF No. 1 ("Pet."). ("The People failed to prove identity and unlawfully [sic] entry. . . . Neither of Shandal's [sic] testified that, the defendant lacked permission and authority to enter their house. There is nothing unlawful of the entry.").

## I.   Background

### A.   Proceedings Before Trial

Police officers arrested Chander on September 15, 2009 after multiple violent incidents.  Before trial, the Supreme Court held hearings on (1) Chander's competence to stand trial; (2) his motions to suppress evidence obtained in a search of his car and a statement he made to an emergency medical services worker; and (3) his motion to dismiss the indictment on speedy-trial grounds.  All three motions were denied.

### B.   Trial

Trial began on October 23, 2012 before Justice Salvatore J. Modica.[2]

#### 1.   The State's Case

The State argued that Chander's motive for the events of September 2009 arose "almost two years" beforehand, *see* Ram Shandal ("Ram") 417:1-7, ECF No. 12-3, when the targets of the arson — Ram and Parveen Shandal — "sheltered" Chander's wife and children for two days while they were fleeing his abuse.  *Id*. at 490:25. (Chander was arrested in June 2007 for "assaulting his wife with a knife," *see* Hearing Tr. dated Oct. 23, 2012, at

---

[2] Respondent submitted the state court record at ECF Nos. 12 to 12-5. This order cites to the trial transcript by naming the witness being examined or stage of the trial (if the Court or counsel is speaking, this order uses "Trial Tr."), and using the transcripts' internal pagination.  When referring to transcripts or records outside the trial, this order uses "Hearing Tr.," "Sentencing Tr.," or otherwise identifies the document referenced.

26:3-16, ECF No. 12-1, following which he and his wife separated.  Sentencing Tr. 18:25-19:2, ECF No. 12-5.)  The State's theory was that Chander was "going after the people who he blames for his misfortune" — who had, in Chander's mind, "ruined his life."  State's Closing Argument 807:11-13, ECF No. 12-4.

a.   The State's Eyewitness Testimony

The Shandals testified that they had known Chander for many years before the attack.  Parveen Shandal ("Parveen") 312:16, ECF No. 12-3 (estimating she had known Chander for eighteen years); Ram 483:2-484:6 (Mr. Shandal knew Chander before he came to the United States in 1980).  Days before the events in question, Chander came to their house asking to speak with Mr. Shandal.  Parveen 312:17-313:2; Ram 431:10-13.  Mr. Shandal told Chander to leave because he was "deadly drunk." Parveen 312:24-313:5; Ram 431:17-21 (Chander could not "talk" or "stand properly").  Before leaving the Shandals' home, Chander told Mr. Shandal, "I will take care of you and I will close all accounts with you."  Parveen 379:16-17; *see also* Ram 432:1-3 (Chander told Mr. Shandal that he would "take care of you," "finish you," and "settle all accounts with you").

Three days later, on September 15 at approximately 2:30 p.m., Ms. Shandal was home alone when she "saw Vipan Chander was there knocking my door and knocking my window."

Parveen 314:24-25.  A neighbor, Nimisha Patel, testified that
she observed an "Indian guy" near the Shandals' residence at
that time.  Nimisha Patel ("Patel") 582:12-22, ECF No. 12-4.
Despite the earlier threats, Ms. Shandal ignored the man and
went about her business.  Parveen 315:13-15, 315:24-316:2.

     Five to ten minutes later, Ms. Shandal smelled
gasoline in her house.  *Id.* at 317:2-4.  As she approached the
window, she saw the assailant "push . . . some long thing, like
a lighter or something . . . in the window screen."  *Id.* at
318:17-20.  Ms. Shandal then saw flames "all over" her window.
*Id.* at 318:21-22.  "[T]errified," Ms. Shandal called 911 from
her kitchen phone.  *Id.* at 320:20-24.  When the operator asked
Ms. Shandal if she knew the assailant, Ms. Shandal — "paralyzed"
with fright — said she did not.  *Id.* at 321:16-20.
Nevertheless, Ms. Shandal testified at trial that she did see
Vipan Chander and that he "put the fire to my house."  *Id.* at
329:6-7.

     At some point, Ms. Patel (the neighbor) saw the
assailant "r[u]n out" to his car and drive off.  Patel 583:8-21,
584:9-10.  Patel testified that the assailant's car was "silver
gray" with a license plate ending in 1401.  *Id.* at 584:17-
585:22.  She then realized (around 2:45 p.m.) that the Shandals'
"window was burning."  *Id.* at 587:7-19, 604:21-22.  Patel "ran"
to the Shandals' house, filled buckets of water, and

extinguished the flame while Ms. Shandal was on the phone with police.  *Id.* at 588:10-12; *see also* Parveen 323:21-324:1.

The fire department arrived at approximately 3 p.m. Patel 604:15-18.  Ms. Shandal identified the assailant to the fire marshals and police by his full name: Vipan Chander. Parveen 329:4-7.  She then called her husband, who returned home from work around 4 p.m.  *Id.* at 326:14.

At approximately 5 p.m., Ms. Shandal and her husband were standing outside their house with a fire marshal (Peter Clinton) when they saw Chander "peeking" at them from a car parked nearby.  *Id.* at 329:11-16.  The Shandals pointed him out to Clinton.  *Id.* at 328:10-23, 329:11-16; Ram 435:17-21.  As the driver drove off, Clinton recorded the vehicle's license plate — ERT-1401, which was consistent with Patel's partial description. Peter Clinton ("Clinton") 197:14-15, 199:11-13, ECF No. 12-3; Parveen 330:12-15.

The Shandals testified that Chander returned to their house again around 6 p.m.  By this point, the authorities had left.  Ms. Shandal saw Chander "forcefully" open the front door, holding "something behind his back."  Parveen 332:1-2, 333:1-5, 333:25-334:1.  Ms. Shandal warned her husband that Chander had returned, *id.* at 333:12-13, 334:25-335:1, and went to the kitchen to call 911.  *Id.* at 335:21-23.

Mr. Shandal spoke to Chander while his wife was on the phone.  Parveen 335:4-8, 335:25.  Mr. Shandal testified that Chander told him he "did it" (that is, "put [the] house on fire") because "you shelter[ed] my wife."  Ram 440:2-24, 441:6-442:7, 490:23-25.  Chander then struck Mr. Shandal twice on the head with a "hard" object before leaving the house.  Parveen 342:16-343:5; Ram 449:21-25, 450:14-17.

Several minutes later (6:20 p.m.), and roughly a block away, a group of people were "in front of a pizza store hanging out on the sidewalk" and observed a Chevy Impala pull in and park with the front of the car facing the sidewalk.  Solomon Katayev ("Katayev") 271:21-23, 272:21-273:4, ECF No. 12-3.  One member of the group, John Jacubov, told the driver that he needed to change the car's orientation to avoid getting a ticket.  *Id.* at 272:21-273:4.  The driver reversed into the street, held the brake, revved the engine, and then accelerated forward, striking Jacubov in the knee.  *Id.* at 273:21-274:3, 287:7, 289:18-19.  Jacubov's friend, Solomon Katayev, approached the Impala, which "r[an] over" Katayev's foot.  *Id.* at 275:12-18, 294:12-21.  As Katayev chased the car, the Impala "made a 360" and struck Katayev again.  *Id.* at 297:12-22.  The group called an ambulance; Jacubov left on a stretcher.  *Id.* at 276:23-277:3.

NYPD Officer Wilking Nunez arrived at the scene shortly thereafter. Jacubov and Katayev told Nunez they were struck by an "Indian male" driving a Chevy Impala with the license plate ERT-1401 (consistent with the prior identifications). Wilking Nunez ("Nunez") 101:16-17, 103:2, ECF Nos. 12-2 to 12-3. Nunez ran a license-plate search and saw a report of the incident at the Shandals' residence; he went to investigate. *Id.* at 103:12-24.

When Nunez arrived at the Shandals', he found Mr. Shandal bleeding, with a towel over his head. *Id.* at 104:20-23. Upon realizing that the license plates from the incidents matched, Nunez radioed a description of the vehicle — a blue Chevy Impala — to police in the area.[3] *Id.* at 106:13-25.

Police officers began searching for the car. Rachid Elkadi ("Elkadi") 499:14-24, ECF Nos. 12-3 to 12-4. At around 6:30 p.m., officer Todd Keyes saw a car that fit the description. Todd Keyes ("Keyes") 21:2-12, 24:16-17, ECF No. 12-2 (saw a "male Indian" man parked in an "[a]typical" spot). When Keyes approached the Impala, the driver "put his car in reverse," "hit[] a vehicle" behind him, and then accelerated forward, striking Keyes in the legs. *Id.* at 23:15-25, 31:18-22.

---

[3] Nunez's description of the vehicle as blue diverged mildly from that of the Shandals' neighbor, Patel, who described the car as "silver gray." Patel 584:17-585:13.

Then, as Keyes called for assistance, the Impala hit Keyes'
police car before turning down another street.  *Id.* at 32:7-16;
Elkadi 501:2-3 (Officer Elkadi saw that the police car was
damaged when he arrived at the site of the accident); Myungdeu
Lee ("Lee") 552:13-16, ECF No. 12-4 (same).  Officers James
Petronella, Myungdeu Lee, and Rachid Elkadi arrived to assist
Keyes moments later.  Keyes 62:6-14; Elkadi 500:4-12; Lee 552:1-
10.

        At around 6:45 p.m., another NYPD officer – Jerry
Klepadlo — spotted the car nearby.  Jerry Klepadlo ("Klepadlo")
78:3-9, ECF No. 12-2.  Klepadlo activated his siren, called in
the sighting, and followed the Impala for "a few blocks" until
it came to a brief stop in traffic.  *Id.* at 78:18-4.  When
Klepadlo exited his vehicle, the Impala rear-ended the car in
front of it.  *Id.* at 84:2-85:10.  Klepadlo, with his gun drawn,
directed the driver to exit the vehicle.  The driver "laugh[ed]"
at him and continued his attempt to "drive away."  *Id.* at 86:2-
21.

        Hearing Klepadlo's radio transmission, officers Keyes,
Petronella, Lee, and Elkadi drove to his location.  Elkadi
501:20-502:18.  As the officers approached, they saw the Impala
driving back and forth into surrounding cars.  Keyes 41:9-17;
Elkadi 504:5 ("I remember him hitting cars . . . ."); Lee

554:25-555:3 (the driver was "trying to reverse and then put it back into drive and was just going back and forth").

The officers surrounded the Impala, directed the driver to "stop," and began smashing the car's windows with their batons.  Keyes 41:9-17; Elkadi 503:6-10 (as Elkadi approached the car, he heard officers "yelling at the driver to get out of the car and . . . hitting the window"); Lee 554:5-8 (Officer Lee saw "three to four officers attempting to stop the vehicle").  During this sequence, Elkadi testified that he saw the subject car come toward him, and then "the next thing I know I'm on the hood of the car."  Elkadi 523:15-17.  Eventually, Petronella and Lee managed to pull the driver out of the vehicle onto the sidewalk, where they handcuffed him.  Keyes 42:16-22; Elkadi 504:20-23 (Petronella was "reaching in" the suspect's vehicle "to get him out of the car"); Lee 554:16-19, 556:16-19 (Lee had to "pull" the driver's "arms because he was holding on to the steering wheel of the vehicle"), 575:5-10.

Officers Keyes, Petronella, and Elkadi were hurt. Keyes 44:5-16 (Petronella was "screaming in agony"); Nunez 108:23-109:5 (Keyes "was hurt," Petronella was "holding his shoulder," and Elkadi wore an oxygen mask on the way to the hospital); Elkadi 509:17-25 (the car struck Elkadi's prosthetic leg); Lee 558:1-3 (Petronella "yelled out that his arm . . . was in immense pain").

Officer Nunez arrived at the scene shortly thereafter. He confirmed that the Impala's license plates matched the earlier reports.  Nunez 111:2-5.  He saw the man he identified as Chander sitting "calm[ly]" on the sidewalk by the car, but noted that the man's eyes were "red."  *Id.* at 111:15-16.  Nunez later met Chander at the 112th Precinct stationhouse (Chander having been transported there in another police vehicle), and accompanied him from the precinct to a hospital in an ambulance. *Id.* at 111:21-112:5.  In the ambulance, Nunez smelled alcohol on Chander's breath, *id.* at 111:18-112:5, and heard Chander tell an EMT that he had been drinking.  *Id.* at 151:21-24.

b.   Cross-Examination of the State's Witnesses

In cross-examining the State's witnesses, the defense focused on (1) purported inconsistencies in the Shandals' testimony (especially regarding their eyewitness identifications); and (2) indications that Chander was heavily intoxicated during the encounters.

With the Shandals, the defense attempted to establish, first, that Chander would not have been aware that anyone was inside the Shandals' home when he lit the fire.  *See* Parveen 388:6-8 (Ms. Shandal testified that outsiders "can't see inside" the house through the window Chander torched).  Second, counsel elicited testimony that Chander had previously thanked the Shandals for housing his wife and children two years earlier.

*Id.* at 417:2-13; Ram 488:14-15 (Mr. Shandal testified that Chander "said thank you very much that you let my children and wife stay with you").  And third, counsel sought and received Mr. Shandal's acknowledgment that he "didn't ask [Chander] to leave" the house when he entered with the tire iron.  Ram 480:11-18.

The defense also sought to highlight perceived inconsistencies between Mr. Shandal's testimony at trial and his testimony at a February 2011 *Outley* hearing.  Counsel focused, first, on the circumstances in which Mr. Shandal saw the man parked near the Shandals' house.  *Compare* Ram 472:13-15 (testifying at trial that three other people, including his wife, were present) *with* Ram 473:19-24 (stating that he "told th[e] five people who were there" when he saw Chander); *compare also* Ram 475:9-10 (testifying that he was "outside" when he saw Chander) *with* Ram 474:20-22 (stating that "I peeped out the window and both of us saw [Chander]").

Lastly, the defense elicited testimony from multiple witnesses that the suspect displayed signs of intoxication. Ashraf Kamal ("Kamal") 17:18-21 (Kamal, whose car Chander rear-ended before the arrest, testified that Chander's eyes were "puffy or bloated"); Nunez 111:16 (Chander's "eyes were red"); Nunez 128:19-20 (Nunez smelled alcohol on Chander).  Officer Nunez also testified that when he asked Chander at the hospital,

"do you know why you are here" or "what you have done," Chander
replied that he "didn't know" or "didn't remember."  Nunez
141:7-42:12 (cleaned up).  Mr. Shandal, however, when asked
whether Chander appeared "to be perfectly sober" at the time he
attacked Mr. Shandal, testified that Chander was "[v]ery normal,
yes, sir . . . . You could say sober too, yes."  Ram 494:24-
595:3.

       c.   The State's Physical Evidence

      The State also introduced: (1) the results of a blood-
alcohol test taken the night of the incident that showed
Chander's blood-alcohol content was at least .157, nearly twice
the legal limit of .08, *see* Melissa Zaug ("Zaug") 250:12-14, ECF
No. 12-3; Chris Seeger ("Seeger") 167:4-5, 170:15-17, ECF No.
12-3; (2) a photograph that Fire Marshal Clinton took at the
Shandals' house showing (in his words) "a couple of rags on the
tile floor" containing "stains on it that are consistent with
that of blood," Clinton 206:21-23, 209:9-15; (3) recordings of
two of the three 911 calls Ms. Shandal made to the police; and
(4) items obtained from Chander's car on the night and morning
after the incident, including a tire iron, an empty bottle of
whiskey, and a soda bottle that (according to Fire Marshal
Clinton) smelled like gasoline.  Clinton 203:7.

d.   Defense Efforts to Exclude Physical Evidence

Chander took issue with two aspects of the State's physical evidence in particular.  First, the defense moved for a mistrial (or, in the alternative, an adverse-inference instruction) because the State had failed to preserve the "bloody" towels in Marshal Clinton's photograph.  The fire marshal did not voucher and retain the bloody towels but photographed them, and those photographs were admitted into evidence at trial.  Trial Tr. 470:12-14.  This failure, Chander argued, deprived the defense of the opportunity to meaningfully dispute that the substance on those towels was in fact human blood.  *Id.* at 397:6-13.  And second, Chander argued that the 911 call audio should have been excluded because "the prejudice" that would "result from the admission of those recordings . . . would be enormous."  *Id.* at 359:13-15.[4]  Justice Modica denied these requests.

2.   The Defendant's Motion for a Trial Order of Dismissal

At the close of the State's case, the defense moved to dismiss every count of the indictment for insufficient evidence pursuant to New York Criminal Procedure Law ("CPL") Section

---

[4] Chander argued on appeal, and argues again here, that the 911 calls should have been excluded because they altered (*i.e.*, converted to a CD-ROM, and because the State redacted Ms. Shandal's phone number from the recording).  But at trial, defense counsel disclaimed any challenge to the authenticity of the recordings.  Trial Tr. 359:7-8 ("I'm not challenging the authenticity of the calls themselves.").

290.10.  Trial Tr. 615:12-13.  The defense argued that (1) "a good many" of the charges should be dismissed because Ms. Shandal could not have seen that it was Chander who set fire to her home (given that the blinds were down), *id.* at 616:4-12; (2) the second-degree arson count and one of the two reckless-endangerment counts should be dismissed because Chander could not have known Ms. Shandal was inside the home when he lit the fire; (3) the burglary charge should be dismissed because Chander did not enter the Shandals' home unlawfully; and (4) the assault counts should be dismissed because "there was no intent formed to satisfy . . . [a]ny counts charging an intentional assault," given Chander's level of "intoxication."  *Id.* at 628:18-629:6.  This last motion was based on the rule that "evidence of intoxication of the defendant may be offered by the defendant" to negate "an element of the crime charged."  N.Y. Penal Law § 15.25; *see also People v. Flores*, 836 N.Y.S.2d 273, 275 (App. Div. 2007) ("[A]n intoxicated person can form the requisite criminal intent to commit a crime, and it is for the trier of fact to decide if the extent of the intoxication acted to negate the element of intent.").[5]

---

[5] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

Justice Modica denied these motions on the merits. Trial Tr. 632:4-12.

### 3.   The Defense Case and the State's Rebuttal

The defense presented alternative theories of the case: namely, that Chander did not commit the crimes in question, and "even if its proven that [Chander] committed the offenses he's charged with, he didn't commit them with the intent to do so" because he was intoxicated. *E.g.*, Trial Tr. 527:12-15, 522:24-25, ECF No. 12-2 (defense opening statement).

a.   Chander's Testimony

Petitioner took the stand in his own defense.  He was the only witness the defense called.

There was little-to-no overlap between Chander's recitation of the events of September 15, 2009 and the prosecution's.  In Chander's account, he never interacted with any of the victims.  Instead, he offered an alibi: he had spent the afternoon in question — from 2:30 p.m. until 5 p.m. — at the house of Shivant Kutwal, a friend of his who is also Ms. Shandal's brother.  Vipan Chander ("Chander") 665:4-24, 712:17-23, ECF No. 12-4.  The police arrested Chander, he testified, after someone "rear ended" him at an intersection that afternoon.  *Id.* at 667:18-25.  After the impact, a police officer — the first one Chander had seen that day — struck him on the head.  *Id.* at 668:15-669:15.  Chander regained

16

consciousness in the hospital, where he discovered he had been handcuffed.  *Id.* at 671:11.

Chander specifically denied that he (1) knew the Shandals had "sheltered" his wife, *see id.* at 701:6-702:23;[6] (2) visited the Shandals' home days before the alleged arson, Chander 661:6-8, 662:1-16 (testifying that he was not drunk on September 12 and went to an Alcoholics Anonymous meeting); (3) consumed alcohol on the day of the charged crimes, *id.* at 674:1-7 (attributing his blood-alcohol reading to "Tylenol 3" (which contains Codeine) that he took "that afternoon"); (4) visited the Shandals' home that day, *id.* at 674:22-24; (5) struck a "young man" with his car, *id.* at 669:16-670:3; (6) crashed into a police officer's vehicle, *id.* at 672:2-7; or (7) evaded police.  *Id.* at 669:1-25.

Chander also denied knowing how the liquor bottle and tire iron wound up in his rental car.  *Id.* at 670:9-19.  He testified that he did not have "any anger" toward the Shandals, whom he had known since his time in India.  *Id.* at 674:13-15.

Chander acknowledged that at the time of the incident, he was taking "psychiatric medicine" (Zoloft and Trazadone) and "Tylenol Number 3" on a regular basis.  *Id.* at 658:10-659:3.  He

---

[6] This testimony was inconsistent with his lawyer having elicited (from Mr. Shandal) that Chander had "thanked" them for sheltering his wife and children.  Ram 488:9-21.  Chander's counsel mentioned Chander's thank you to the Shandals again in his closing argument.  Trial Tr. 793:9-20.

also acknowledged that he had attended two in-patient alcohol programs in the past several years.  *Id.* at 659:16-25.

      b.   Cross-Examination of Mr. Chander

      The State devoted much of its cross-examination of Chander to illustrating inconsistencies in Chander's testimony. For example, the State confronted Chander about his denial that he knew, at the time of the incident, that the Shandals had sheltered his wife in the past.  *Id.* at 706:9-17.  The ADA sought to impeach Chander with his previous testimony to the grand jury, in which he had acknowledged that the Shandals "kept my wife for three, four days."  *Id.* at 706:9-23.

      In addition, under questioning by the prosecution, Chander abandoned his direct testimony that he harbored no resentment against the Shandals.  *Id.* at 674:13-17. Specifically, Chander accused Mr. Shandal of "ruining [his] life" by inducing Chander's wife to seek orders of protection against him.  *Id.* at 708:21-709:8.  Chander later backtracked on this and answered "no" when asked if it was "fair to say that [he didn't] like" Mr. Shandal.  *Id.* at 709:23-25.

      c.   The State's Rebuttal Witness

      In rebuttal, the State called Shivant Kutwal (Ms. Shandal's brother), who was the subject of the alibi that Chander offered on direct.  Kutwal testified that he never saw Chander on the date in question, and had never — at any time —

invited Chander to his home alone.  Shivkant Kutwal ("Kutwal")
738:21-739:5, ECF No. 12-4.  According to Kutwal, the last time
he saw Chander was five or six months prior to the incident,
when Kutwal called the police to remove a "dead drunk" Chander
from his porch.  *Id.* at 752:5-753:9.

Chander's attorney did not renew his motion to dismiss
the charges for insufficient evidence after the defense case and
State's rebuttal witness.

4.  Defense Closing Arguments

In closing, the defense argued that Chander was too
intoxicated to form the requisite intent for several of the
crimes charged, that there were numerous inconsistencies in the
prosecution's evidence, and that Chander lacked a motive to
commit the crimes, among other things.

5.  The Jury Charge and Verdict

Justice Modica instructed the jury (at the defense's
request) that "in determining whether the defendant acted with"
the requisite state of mind, "you may consider whether
defendant's mind was affected by intoxicants to such a degree
that he was incapable of performing the mental state" required
to commit the crimes.  Trial Tr. 887:17-21.  Justice Modica then
submitted the following counts to the jury:

- one count of burglary in the first degree;

- one count of arson in the second degree and one count of arson in the third degree;

- four counts of assault in the second degree (for the attack on Mr. Shandal at the Shandal home and for hitting officers Keyes, Petronella, and Elkadi with his car);

- three counts of assault in the second degree, specifically preventing a police officer from performing a lawful duty;

- one count of attempted assault in the first degree (for the attack on Mr. Shandal);

- two counts of reckless endangerment (for setting the fire and striking officers with his vehicle);

- three counts of criminal possession of a weapon in the third degree;

- two counts of operating a motor vehicle while intoxicated; and

- one count of resisting arrest.

On the second day of deliberations, the jury found Chander guilty on all counts except two, acquitting him of (1) arson in the second degree; and (2) criminal possession of a weapon in the third degree (the weapon in question being the car

with which Chander allegedly hit John Jacubov and Solomon
Katayev). *Id.* at 971:19-974:14.

6.  <u>Sentencing</u>

At the sentencing hearing on February 27, 2013, the
defense argued that Justice Modica should set aside the verdict
pursuant to N.Y. CPL Section 330.30.  This motion was based on
substantially the same arguments as the mid-trial motion to
dismiss — namely, that there was insufficient evidence that
Chander acted with the requisite state of mind, entered the
Shandals' home unlawfully, or ever struck officer Elkadi with
his vehicle.

Justice Modica denied the motion.  On the defense's
argument that the evidence established that Chander was
intoxicated and could not form the requisite *mens rea*, Modica
reasoned that "Chander himself . . . absolutely denied drinking
alcohol" on the day in question, and never "provided any
testimony as to the specific impact on his mental state."
Sentencing Tr. 8:4-14.  Modica also concluded that, with respect
to the burglary conviction, the evidence was "more than legally
sufficient to support the jury's verdict that the defendant
knowingly and unlawfully entered a dwelling with the intent to
commit a crime."  *Id.* at 9:11-14.  Lastly, Justice Modica
concluded that the evidence "was more than legally sufficient to

establish that Officer [Elkadi] sustained a physical injury" for purposes of the assault charge.  *Id*. at 9:15-20.

Justice Modica then sentenced Chander to a prison term of thirty to thirty-five years.  *Id*. at 29:18-22.  In imposing the sentence, Justice Modica stated that Chander was an "extremely violent and dangerous man" whose release would "endanger the lives of people in the community."  *Id*. at 23:21-24:4.

## C.   Appeals

Chander appealed the conviction to the Second Department.  He argued (through new counsel on appeal) that (1) the state failed to prove intent (or, in the alternative, depraved indifference) in light of his "extreme intoxication"; (2) his trial counsel was constitutionally ineffective for failing to call an expert witness on intoxication, Pet.'s Br. to App. Div., at SR 24-36, ECF No. 12; (3) the first-degree reckless endangerment conviction was "against the weight of the evidence," given that the jury acquitted him on the second-degree arson charge (and thus concluded, presumably, that Chander lit fire to the Shandals' home without knowing anyone was inside), *id*. at 37-41; and (4) the sentence was excessive. *Id*. at 41-44.

In addition to his counsel's brief, Chander submitted a supplemental brief *pro se*, raising additional arguments.  He

makes several of those arguments here as well: (1) the recording of Ms. Shandal's 911 calls should have been suppressed because they were converted from their original format to CD-ROM, *see* Pet.'s Supp. Pro Se Br. to App. Div., at SR 147, ECF No. 12; (2) the State violated *Brady v. Maryland* by failing to produce a video of Chander at the hospital consenting to his blood being drawn, *id*. at SR 153, *see also* Pet. 56 (notice from State that it intended to offer the video at issue); (3) the items found in Chander's car should have been suppressed because the search was conducted without a warrant; (4) the State should have preserved the bloody towels that the fire marshal photographed; (5) the evidence was insufficient to support the burglary conviction because the State failed to prove Chander's identity or unlawful entry; (6) the indictment should have been dismissed under CPL Section 30.30 on speedy-trial grounds; (7) various witnesses' testimony was not credible; and (8) Justice Modica delivered confusing jury instructions (among other things). *See generally* Pet.'s Supp. Pro Se Br. to App. Div., at SR 138-07.

The Appellate Division affirmed Chander's conviction, rejecting the arguments of his counsel and (in a single sentence) those contained in Chander's *pro se* submission. *People v. Chander*, 140 A.D.3d 1181, 1182-83 (2d Dep't 2016). The appellate court held that (1) the intoxication defense was "unpreserved for appellate review" and meritless; (2) the

ineffective-assistance claim concerned matters outside the
record on appeal, *id*. at 1182-83; (3) Chander failed to "provide
a sufficient record" for review of his speedy-trial claim, *id*.
at 1183; and (4) the remaining claims were "without merit."  *Id*.
The Appellate Division did, however, reduce Chander's sentence
by five to ten years by ordering that the burglary and arson
sentences run concurrently rather than consecutively.  *Id*. at
1182.

　　　　Chander sought leave to appeal to the New York Court
of Appeals on the same bases.  Pet.'s Letter dated July 5, 2016
requesting leave to appeal, at SR 255-63, ECF No. 12.  This
request was denied in a summary order.  *See People v. Chander*,
28 N.Y.3d 1026 (2016).  Chander then filed a motion with the
Appellate Division, seeking reargument on his speedy-trial
claim.  Pet.'s Mot. to Reargue dated July 19, 2016, at SR 270-
75, ECF No. 12.  In that motion, Chander explained that the
Appellate Division's page-limit rules prevented him from filing
the full record supporting his speedy-trial claim.  Pet.'s
Letter dated Aug. 14, 2017, at SR 307-09, ECF No. 12.  The
Appellate Division denied this motion without explanation.  App.
Div. Decision dated Nov. 6, 2017, at SR 311, ECF No. 12.

　　　　Chander did not seek post-conviction collateral review
under N.Y. CPL Section 440.10.

## II.  Analysis

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides that a reviewing court may grant a writ of habeas corpus only if the state's

> adjudication of the claim — (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

### A.  Legal Sufficiency of the Evidence

Chander argues here that his conviction violated due process because the evidence at trial was legally insufficient — on all counts — to establish that he "form[ed] an intent to commit the charged crimes."  Pet. 6.  This is so, he claims, because of his intoxication level.  *Id.*  Chander also contends that the evidence was legally insufficient to support the burglary conviction because the State failed to prove that he entered the Shandals' home "unlawfully" or, indeed, that he entered it at all.  *Id.* at 25.

The Appellate Division rejected the intoxication defense as both procedurally barred and meritless, and the burglary-specific arguments as meritless.  For the reasons that follow, the petition for relief on this ground is denied.

1.  _Assault_

At the conclusion of the prosecution's case-in-chief, Chander invoked the intoxication issue to argue that the assault charges — but no others — should be dismissed pursuant to N.Y. CPL § 290.10, because his intoxication precluded the requisite finding of _mens rea_.  Trial Tr. 628:18-629:6.  The trial court denied this motion.  _Id._ at 633:4-6.  Chander then put on his defense case, and he did not renew his motion to dismiss at the conclusion thereof.  _Id._ at 726:11-12.  The People then put on one rebuttal witness, the parties rested, and the case proceeded to verdict.  Based on the record before me, it appears that Chander did not raise the sufficiency argument again until sentencing, when he moved to set aside the verdict under N.Y. CPL § 330.30.  Sentencing Tr. 3:13-15.  That motion was denied.

A habeas petitioner cannot succeed on a claim grounded in federal law when a state court has decided the question and that "decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment." _Cone v. Bell_, 556 U.S. 449, 465 (2009).[7]  To be "independent" of

---

[7] _Cone v. Bell_, like other binding case law, says flatly that federal courts "_will not review_ questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment." 556 U.S. at 465 (emphasis added) (citing _Coleman v. Thompson_, 501 U.S. 722, 729 (1991)).  In _Coleman_, the Court suggested this prohibition on further review was jurisdictional, even on habeas (as opposed to direct) review.  _See_ 501 U.S. at 730-31 (to reach the merits of a habeas challenge to a state

federal law, the court's "reliance on state law must be clear from the face of the opinion." *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir. 2009).  To be "adequate" to support the holding, the state-law basis must be premised on a state rule that is "firmly established and regularly followed" by courts of the state. *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999).

"Firmly established" in this context means that the rule was clearly manifested in the given state's law at the time the default occurred, such that the petitioner is deemed to have been on notice of it.  *See Ford v. Georgia*, 498 U.S. 411, 424-25 (1991) (concluding that state procedural rule was not firmly established because it was "unannounced at the time of petitioner's trial").  Firmly established rules can appear in the decisions of the state's highest court, as well as in procedural rules or statutes.  S*ee, e.g.*, *Johnson v. Lee*, 578 U.S. 605, 608 (2016) (concluding that California procedural rule was firmly established because "decades before [petitioner's] June 1999 procedural default, the California Supreme Court

---

ruling supported by an independent and adequate state ground would serve as "an end run around the limits of this Court's jurisdiction").  Nevertheless, lower courts regularly go on to explain, in the alternative, that they would *deny* — on the merits — challenges to state rulings resting on independent and adequate state grounds, as I do below.  *See, e.g.*, *Walker v. Cunningham*, No. 08-CV-2735, 2008 WL 4737664, at *3-4 (E.D.N.Y. Oct. 28, 2008); *Reyes v. Connolly*, No. 07-CV-2468, 2010 WL 3036766, at *6-7 (E.D.N.Y. July 30, 2010); *see also* Brian R. Means, *Federal Habeas Manual* § 9B:5, at 1249 (2022) (citing cases).

warned defendants in plain terms that, absent special circumstances, habeas will not lie where the claimed errors could have been" but were not raised on direct appeal). The Supreme Court has made clear that even a "discretionary state procedural rule" can be firmly established. *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009).

Chander raised the intoxication-related insufficiency defense to the assault charge twice before the trial court — once at the conclusion of the prosecution's case-in-chief, and again at sentencing. Nevertheless, the Appellate Division held that Chander had failed to preserve it. *Chander*, 140 A.D.3d at 1182. The appellate court did not say why this argument was unpreserved; its opinion merely cited N.Y. CPL § 470.05(2), which provides generally that arguments on appeal must be properly preserved, and cases applying that rule. *Id.*

It is possible that the Appellate Division reached its decision for the reasons articulated in *People v. Hines*, 97 N.Y.2d 56, 61-62 (2001), which held that "a defendant who presents evidence after a court has declined to grant a trial motion to dismiss made *at the close of the People's case* waives subsequent review of that determination," absent a later renewal of that motion. *Id.* (emphasis added). For the reasons set out in the margin, however, it is not obvious that *Hines*' reasoning applied to Chander's direct appeal, because Chander did raise

the sufficiency of the assault-related evidence again at
sentencing (albeit under Section 330.30).[8]

Nevertheless, the Appellate Division's holding
dictates that Chander's insufficiency argument cannot succeed
here, because federal courts generally do not second-guess state
courts' interpretation of their own procedural
requirements. *See* Brian R. Means, *Federal Habeas Manual*
§ 9B:22, at 1269 (2022) ("Federal courts generally will not
consider whether the state court properly applied its default
rule to the petitioner's facts."); *see also White v. West*, No.
04-CV-2886, 2010 WL 5300526, at *7 n.13 (E.D.N.Y. Dec 6, 2010)
(noting same principle and citing cases).  There is an exception
to this rule, which applies when "the state court's
interpretation is clearly untenable and amounts to a subterfuge
to avoid federal review of a deprivation by the state of rights
guaranteed by the Constitution."  Means, *Federal Habeas Manual*

---

[8] In *Hines*, the trial court had, pursuant to N.Y. CPL § 330.30 at
sentencing, merely *reconsidered* its mid-trial denial of the appellant's
insufficiency argument.  97 N.Y.2d at 61.  Hines had waived that argument,
however, by failing to renew the insufficiency claim after he put on his own
defense case.  The New York Court of Appeals held that this was waiver
because even if the evidence had been insufficient at the close of the
People's case-in-chief, the missing proof might have been supplied during the
defense case that followed.  *Id.*  That is to say that the trial court in
*Hines* never made a comprehensive consideration of the trial evidence as a
whole.  *Id.* at 61-62.  At sentencing in Chander's case, in contrast, the
trial court did consider (pursuant to Section 330.30) the trial evidence as a
whole.  *See* Sentencing Tr. 8:4-14 (in assessing sufficiency of the evidence,
trial court considers testimony from Chander's defense case).  Regardless,
the Appellate Division's waiver finding controls, for the reasons set out
above.

1269.  But there is no reason to suspect that the Appellate
Division was engaging in anything resembling such
subterfuge.  Accordingly, this claim is procedurally barred
under the adequate and independent state ground doctrine.  *E.g.*,
*Harris v. Reed*, 489 U.S. 255, 262 (1989).

In any event, Chander's legal-sufficiency challenge to
the assault charge is meritless.  After rejecting this argument
as unpreserved, the Appellate Division went on to reject it on
the merits as well, concluding that the evidence "was legally
sufficient to establish beyond a reasonable doubt that the
defendant manifested the requisite criminal intent."  *Chander*,
140 A.D.3d at 1182.  That decision is entitled to AEDPA
deference.  Thus, Chander has to show that the state court's
decision was an unreasonable application of clearly established
federal law as determined by the Supreme Court.  28 U.S.C.
§ 2254(d)(2).

In reviewing legal-sufficiency claims, the "relevant
question is whether, after viewing the evidence in the light
most favorable to the prosecution, *any* rational trier of fact
could have found the essential elements of the crime beyond a
reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319
(1979).  This standard is easily met here.

Intoxication is not "a defense to a criminal charge"
under New York state law.  N.Y. Penal Law § 15.25.  But

"evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negative an element of the crime charged." *Id.* The parties did introduce substantial evidence of Chander's intoxication: the blood alcohol test, Chander's own testimony, and testimony from some witnesses that Chander's breath smelled of alcohol. But Chander offered no evidence about the *effects* of his intoxication on his mental state. At the same time, the State's evidence showed that Chander maintained a substantial level of coherence despite any intoxication: he was able to light a fire, to locate (and drive to) the Shandals' home multiple times, and to evade the police for a period. A reasonable jury could find, based on this evidence, that Chander acted with the requisite *mens rea*. *See, e.g.*, *People v. Alston*, 838 N.Y.S.2d 671, 673 (App. Div. 2007) ("[T]he general rule is that an intoxicated person can form the requisite criminal intent to commit a crime, and it is for the trier of fact to decide if the extent of the intoxication acted to negate the element of intent."); *see also People v. Gelling*, 82 N.Y.S.2d 679, 684 (App. Div. 2018) (rejecting weight-of-evidence argument even though "there was evidence in this case that defendant consumed alcohol"), *amended by* 82 N.Y.S.2d 759 (App. Div. 2018); *Heidgen v. Graham*, No. 19-266-pr, 2021 WL 4452112, at *2 (2d Cir. Sept. 29, 2021) (affirming denial of habeas relief, despite petitioner's blood-alcohol content, where

31

evidence showed Petitioner was "a regular drinker and sober enough on the night of the crash to stand on his feet, dance, and hold appropriate conversation").

2.   Charges Other than Assault

For the other charges, the Appellate Division unquestionably applied New York's contemporaneous-objection rule correctly to reject the intoxication-related sufficiency challenge.  This is because Chander did not "specifically direct[]" this challenge to any other count, as required by *People v. Gray*, 86 N.Y. 2d 10, 19 (1995).  The Second Circuit has previously determined that Section 470.05(2)a, which requires a contemporaneous objection to preserve an issue for appeal, is "firmly established and regularly followed" in New York state courts.  *Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011) ("[W]e have held repeatedly that the contemporaneous objection rule is a firmly established and regularly followed New York procedural rule."); *see also Sweeney v. Laffin*, No. 12-CV-6483, 2016 WL 9736116, at *5 (S.D.N.Y. Aug. 8, 2016) (rule requiring defendants to preserve legal-sufficiency arguments by moving for a trial order of dismissal "specifically directed" at the alleged error is an adequate state-law ground), *report and recommendation adopted*, No. 12-CV-6483, 2017 WL 4342138 (S.D.N.Y. Sept. 28, 2017).  Thus, Chander's intoxication-based insufficiency claims are procedurally barred.

To overcome this default, Petitioner must either "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Galdamez v Keane*, 394 F.3d 68, 73 (2d Cir. 2005).  The instant Petition does not satisfy this standard because Chander presents no cause for the default.  Indeed, he does not acknowledge the default at all.

3. Burglary

Chander next argues that even if his intoxication argument fails, the evidence was legally insufficient to support the burglary conviction for a separate reason.  The State, Chander maintains, did not establish that his entry into the Shandals' home was "unlawful," as required by the New York burglary statute, N.Y. Penal Law § 140.30.  This argument is predicated on the Shandals' not having testified that he "lacked permission and authority to enter their house."  Pet. 25. Indeed, Petitioner also argues that the State failed to establish that he entered the Shandals' home at all — that is, that the intruder's identity was not proved beyond a reasonable doubt.[9]

---

[9] *See* Pet. 25 ("The People failed to prove identity and unlawfully [sic] entry . . . .").

This claim is not procedurally barred.  Chander raised it in his motion for a trial order of dismissal at the close of the State's case.  Trial Tr. 620:13-15 ("[T]hat count has to fall because there's absolutely no proof that the defendant entered or remained unlawfully in the house.").  On direct appeal, the Appellate Division denied this sufficiency claim on the merits.  Accordingly, the appellate decision is subject to an additional "layer[] of judicial deference" here.  *Coleman v. Johnson*, 566 U.S. 650, 651 (2012).

As noted above, the question before the Appellate Division was whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319.  The Appellate Division concluded that this standard was met.  And Section 2254 dictates that "federal court[s] may not grant the writ of habeas corpus unless the state courts' [merits] decision was based on an unreasonable application of clearly established Federal law."  *Garbutt v. Conway*, 668 F.3d 79, 81 (2d Cir. 2012).  Applying these standards together, the inquiry on federal habeas review is whether "*no* reasonable court could have held that *any* reasonable jury could have read the evidence to establish petitioner's guilt beyond a reasonable doubt."  *Id.* at 81-82.

Chander's petition does not clear this hurdle.  For starters, the identification of Chander as the perpetrator was

more than sufficient.  Among other things: the Shandals, who had known Chander for at least eighteen years, identified him as the culprit at trial.  Indeed, Ms. Shandal identified him the day of the incident, even if she failed to do so on the initial 911 call.  Parveen 329:4-7.  The modest delay on her part is not particularly surprising, given that her home was on fire when she made the 911 call and she was "paralyzed" with fright.  *Id.* at 321:16-20.  The police found a tire iron in Chander's vehicle, which corroborated the Shandals' testimony that the intruder wielded a "hammer"-like object.  And Officer Nunez placed Chander's rental car one block from the Shandals' residence ten minutes after the burglary took place.  Nunez 101:16-17; *see also* Trial Tr. 834:10-17 (Chander stipulated that he rented the car in question).

Likewise, the evidence was more than sufficient to establish the "unlawful" nature of Chander's entry into the Shandals' home.  Under New York's burglary statute, entry is unlawful when a person "is not licensed or privileged" to enter the premises.  N.Y. CPL § 140.00(5).  One is licensed or privileged to enter a home, in turn, "when he has obtained the consent of the owner."  *People v. Graves*, 555 N.E.2d 268, 269 (N.Y. 1990).  Chander claims the Shandals consented to his entry because their door was unlocked, he knew them, and neither of them told Chander to leave.  But passive acquiescence is not a

35

license to enter or remain, especially when the entry is by someone who had set the premises on fire earlier in the day and then returned with a tire iron in hand.  An intruder's past "abusive behavior" toward homeowners may evidence a lack of permission to enter the premises even absent an express denial. *See People v. Melendez*, 613 N.Y.S.2d 867, 867 (App. Div. 1994) (holding that jury "could reasonably have found" lack of permission to enter given the intruder's past conduct, even though intruder entered the victims' house without force and was never told to leave).  Here, the Shandals testified that Chander threatened them three days earlier, in addition to lighting their house on fire earlier that day.  Ms. Shandal also testified that she left the room to call the police as soon as Chander entered the home, which would have served as some indication that Chander's license to be there was lacking.

Applying the doubly deferential standard set out above, Chander's claim fails.  *Garbutt*, 668 F.3d at 81-82.

## B.   Ineffective Assistance of Counsel

Chander alleges that his trial counsel violated his right to effective assistance of counsel because he failed to call an expert witness to support Chander's intoxication defense.  This claim is unexhausted, despite Chander having pressed it on direct appeal, because the proper venue for this challenge was a N.Y. CPL 440.10 motion (as discussed below).

Notwithstanding this failure to exhaust, I deny Chander's ineffective-assistance claim as plainly meritless.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

    1.  <u>Exhaustion</u>

To receive federal habeas relief, a petitioner must have "exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b).  To do so, a petitioner must present his federal claim to the highest court of the state.  *Grey v. Hoke*, 933 F.2d 117, 119 (2d Cir. 1991).  A petitioner may do so by either "raising the federal claim on direct appeal to the state's highest court or by collateral attack of the conviction and subsequent appeal of the denial of that application to the state's highest court."  *Harris v. Hollins*, No. 95-CV-4376, 1997 WL 5909, at *2 (S.D.N.Y. Jan. 7, 1997).  "An applicant shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented."  28 U.S.C. § 2254(c).

On direct appeal, the Appellate Division determined that the alleged failure by Chander's counsel required consideration of facts outside the trial record.  *See Chander*,

140 A.D.3d at 1183 (concluding that ineffective assistance claim "is not properly raised on direct appeal" because it "involves matter dehors the record").  Under New York law, "the proper vehicle for review of such extraneous matters is a post judgment motion to vacate the judgment" pursuant to CPL Section 440.10.  *Edwards v. Rock*, No. 09-CV-1387, 2013 WL 80176, at *9 (E.D.N.Y. Jan. 7, 2013); *see also People v. Maffei*, 127 N.Y.S.3d 403, 407 (2020) ("[A]lthough there may be some cases in which the trial record is sufficient to permit a defendant to bring an ineffective assistance of counsel claim on direct appeal, in the typical case it would be better, and in some cases essential, that an appellate attack on the effectiveness of counsel be" brought under N.Y. CPL Section 440.10).  Chander has not availed himself of that process.  Accordingly, his ineffective-assistance claim remains unexhausted.  *See, e.g.*, *Edwards*, 2013 WL 80176, at *9.

    2.  <u>Merits of the Claim</u>

       In any event, the claim is without merit.  Under the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984), an individual claiming ineffective assistance (1) "must show that counsel's performance was deficient," meaning that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," and (2) "that the deficient performance prejudiced

the defense" in that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Bennett v. United States*, 663 F.3d 71, 84 (2d Cir. 2011). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.

Chander's ineffective-assistance claim does not survive the first step of the *Strickland* test. Despite counsel's attempt to pursue an intoxication defense, Chander testified that he had nothing to drink on the day in question and, indeed, that he was elsewhere during the events in question and had an alibi to prove it. When asked on direct examination how he could explain that a blood alcohol test on the day of the crime spree showed he was intoxicated, Chander said, "I don't know because I only took Tylenol Number 3 that afternoon." Chander 674:1-7. Chander also explained that he was with a friend at his home from "between 2:30 and five. Maybe over five." *Id.* at 665:22-24. On cross-examination, Chander again stated that he "was not drinking" on the day in question. *Id.* at 711:24-25.

This testimony obviously put Chander's counsel in a difficult position. As Justice Modica noted, Chander's counsel's "carefully plotted-out [intoxication] defense . . .

was severely undermined by his decision to take the stand and . . . deny totally that he drank alcohol that day or was intoxicated."  Sentencing Tr. 21:10-13.  "Although it would not have been impossible for counsel to argue inconsistent and alternative theories to the jury, competent trial counsel know that reasonableness is absolutely mandatory if one hopes to achieve credibility with the jury."  *Williams v. Walker*, No. 92-CV-1905, 1993 WL 22128, at *6 (S.D.N.Y. Jan. 26, 1993); *see also id.* (trial counsel was not constitutionally deficient for failing to raise intoxication defense where the defense's theory at trial was factual innocence and mistaken identity)*; Harich v. Dugger,* 844 F.2d 1464, 1471 (11th Cir. 1988) ("A competent attorney completely informed in the intoxication defense and faced with a defendant advocating his factual innocence could well have" declined to pursue an intoxication defense under *Strickland*).  This claim is therefore denied.

C.   **Defective Jury Instructions**

Chander next argues that the jury instructions violated due process — specifically because Justice Modica (1) confused the jury by responding to their question about the intoxication defense with an "irrelevant" question of his own; (2) then delivered defective supplemental instructions on intoxication in response to the note; (3) delivered a "defective reasonable doubt instruction"; and (4) improperly "guid[ed] the

prosecutor to add detail" to the jury instructions at the charging conference.  Pet. 18-19.

This argument raises both exhausted and unexhausted claims.  Chander raised only one of these arguments on direct appeal — namely, the claim that Justice Modica gave a confusing response (but not a defective supplemental instruction) to the jury's question.  Pet.'s Supp. Pro Se Br. to App. Div., at SR 194 (arguing that the "Judge did not give proper reply to the jury's request for guidance that if the jury could take into consideration of the appellant's use of alcohol and medication" because Justice Modica "posed another question to the jury which was not relevant" (quoting Justice Modica's request to the jury for clarification)).

Because Chander raised the jury-note claim to the Appellate Division (which rejected it as meritless), the claim is exhausted.  The remaining claims, however, are unexhausted because Chander did not "fairly present" them to any state court.  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  For the reasons stated below, I deny the unexhausted claims as procedurally barred and deny the exhausted claim as meritless.

1.   The Unexhausted Claims

"A federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred."

*Harris*, 489 U.S. at 263 n.9.  Thus, "[e]ven if a federal claim has not been presented to the highest state court or preserved in lower state courts under state law, it will be deemed exhausted if it is, as a result, then procedurally barred under state law."  *Ramirez v. Att'y Gen. of N.Y.*, 280 F.3d 87, 94 (2d Cir. 2001).

Chander's claims are procedurally barred because he can no longer present them to the highest state court through any procedural vehicle on offer.  He cannot raise the claim on direct appeal.  *See Hoke* 933 F.2d at 120 (petitioners are entitled to only one "request for leave to appeal" to the Court of Appeals on direct appeal).  And he cannot raise the claims in a Section 440.10 proceeding absent cause for his default (which he has not shown).  *See* N.Y. CPL § 440.10(2)(c) (the court "must deny a motion to vacate a judgment" if the claimant could have raised the argument on direct appeal but "unjustifiabl[y] fail[ed] to" do so); *Williams v. Goord*, 277 F. Supp. 2d 309, 318-19 (E.D.N.Y. 2003) ("The Second Circuit and this Court have previously held that the denial of a § 440.10 motion for failure to raise a claim on direct appeal" is an adequate and independent state ground that constitutes a procedural bar).  Because Chander can no longer raise these claims to the highest court of the state, I deem the claims exhausted but deny them as procedurally barred.  *See, e.g.*, *Garavito-Garcia v. United*

*States*, No. 17-CV-5798, 2019 WL 6885868, at *7 (S.D.N.Y. Nov. 13, 2019) (claim that jury instructions were "confusing" was procedurally barred on federal habeas review, because the petitioner failed to raise the argument on direct appeal), *report and recommendation adopted*, No. 12-CR-839-1, 2019 WL 6878346 (S.D.N.Y. Dec. 17, 2019).

As noted above, to overcome a procedural bar on federal habeas review, the petitioner must show (1) cause for the default; and (2) prejudice. Chander provides no justification for his default. And Chander has not, and likely could not, establish prejudice. Indeed, the Petition does not identify any aspect of Justice Modica's reasonable-doubt instructions that were erroneous, indicate why or how Justice Modica's "guiding" the prosecutor with respect to the instructions was improper, or specify why the supplemental instructions on intoxication were defective. These claims are therefore denied.

2.  <u>The Exhausted Claim</u>

As for Chander's claim that Justice Modica confused the jury by asking for clarification in response to their question about the intoxication defense, this (exhausted) argument lacks merit. Because the Appellate Division determined this claim to be meritless, I review it under AEDPA's deferential standard. Applying that standard, I deny the claim.

43

First, Justice Modica acted appropriately in asking the jury for clarification of the note.  Chander has pointed to no Supreme Court precedent — under the due process clause or otherwise — forbidding judges from seeking clarification of an ambiguous jury note.  Here, Justice Modica's process complied with the steps prescribed by the Second Circuit for responding to jury notes.  *See United States v. Mejia*, 356 F.3d  470, 475 (2d Cir. 2004) (observing that "the proper practice for a jury inquiry and response thereto is as follows: (1) the jury inquiry should be in writing; (2) the note should be marked as the court's exhibit and read into the record with counsel and defendant present; (3) counsel should have an opportunity to suggest a response, and the judge should inform counsel of the response to be given; and (4) on the recall of the jury, the trial judge should read the note into the record, allowing an opportunity to the jury to correct the inquiry or to elaborate upon it"); *see also* Trial Tr. 922:17-936:7.

Second, nothing about the instruction the trial court gave after seeking clarification was confusing or otherwise improper.  Chander does not say how or why the jury would have been confused; only that Justice Modica's clarifying question was "irrelevant" and that he "left the jury without necessary tools to consider it."  Pet. 18.

The Supreme Court has held that to establish a due process violation, a federal habeas petitioner must show "both that the instruction was ambiguous and that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Waddington v. Sarausad*, 555 U.S. 179, 190-91 (2009).  In this analysis, the pertinent "question is . . . whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973).

Here, the jury asked whether it could "take into consideration the fact that the defendant may have abused alcohol and medication at the time he entered the home?"  Trial Tr. 922:23-932:1.  Justice Modica asked the jury to clarify two things: "whether or not you're asking me about Saturday, September 12, 2009 or Tuesday, September 15, 2009" (referring to the two days Chander allegedly entered the Shandals' home); and "whether when defendant allegedly entered the Shandal home he had in the past abused alcohol and drugs or whether on September 15, 2009 when he allegedly entered the Shandal home he had allegedly taken a combination of alcohol and drugs." *Id.* at 928:21-929:7.  Shortly thereafter, the jury returned a note clarifying that their question was "in regards to count 1

burglary performed on [September 15, 2009]." *Id.* at 929:13-930:2.  Justice Modica then essentially repeated his prior instruction on the intoxication issue. *See id.* at 932:1-936:7 (explaining, among other things, that "it is for the jury to determine the extent of the defendant's intoxication and whether or not he was so intoxicated . . . that it impaired his mental faculties to such a degree as to prevent him from forming the requisite intent").

At a minimum, this exchange cannot be said to have "so infect[ed] the entire trial that the resulting conviction violate[d] due process." *See Davenport v. Bradt*, 560 F. Supp. 2d 313, 320 (W.D.N.Y. 2008).  Thus, the Appellate Division's denial of this claim as meritless was not "contrary to" or an "unreasonable application of" Supreme Court precedent.  *See* 28 U.S.C. § 2254(d)(1).

## D.  Alleged Evidentiary Errors

Petitioner argues next that the trial court violated his rights to due process and a fair trial by admitting two forms of evidence: first, the recordings of Ms. Shandal's 911 calls, because the calls were converted to a CD-ROM format and altered by the State's redaction of Ms. Shandal's phone number; and second, Marshal Clinton's photograph of the blood-soaked towels, because the State failed to preserve the towels themselves.

These claims are unexhausted.  To exhaust a claim, a petitioner must "fairly present[]" the federal claim to the state courts.  *Picard v.* Connor, 404 U.S. 270, 275 (1971).  A claim is "fairly presented" where the Petitioner "placed before the state court essentially the same legal doctrine he asserts in his federal petition."  *Daye v. Att'y Gen. of N.Y.*, 696 F.2d 186, 192 (2d Cir. 1982).  To afford the state courts a fair opportunity to resolve a federal constitutional claim, it must be clear that the petitioner was relying on federal law in the state court.  *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution.").  To that end, the Court of Appeals has "identified" some "ways in which a petitioner may alert the state court to the [federal] constitutional nature" of a claim:

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Ramirez*, 280 F.3d at 96.

Here, Petitioner presented his evidentiary claim to the Appellate Division as a matter of state law only. He challenged the admission of the photograph and CD-ROMs without mentioning federal constitutional law or citing any federal cases (or state cases that rely on federal cases). Pet. Pro Se Br. to App. Div., at SR 158-160 (towel photograph); *Id.* at SR 147-152 (CD-ROMs). Indeed, at trial, Chander's counsel disclaimed any authenticity challenge to the 911 calls. Trial Tr. 369:708. That prevented the trial judge from addressing at all Chander's argument to the Appellate Division that the State altered the 911 calls. Pet.'s Supp. Pro Se Br. to App. Div., at SR 158. Thus, the federal claims Chander raises here were not "fairly presented" to the state courts. And Chander can no longer raise these claims on direct appeal or in a post-conviction motion under Section 440.10. *Hoke*, 933 F.2d at 120; CPL § 440.10(2)(c). Thus, these claims are procedurally barred.

As noted above, to overcome default, a federal habeas petitioner must show (1) cause for the default; and (2) prejudice. Chander provides no explanation for the default, and the claims are meritless anyway.

1.  The 911 Call Recordings

Chander alleges that the trial court violated his right to due process when it admitted the recordings of Ms. Shandal's 911 calls into evidence. Pet. 21. He claims the

48

recordings were altered and converted into a different format than the original (unspecified) medium. *Id*. This is best understood as a challenge to the authenticity of the 911 call recordings — an argument arising under New York State's evidentiary rules, not federal law.

Generally speaking, it is "not the province of a federal habeas court to reexamine state-court determinations on state-law questions," including those related to admissibility of evidence. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). So, "to establish that an erroneous application of state rules of evidence violates the federal guarantee of due process," a petitioner must show not only a violation of state law, but also "that the state court's erroneous conclusions about New York evidence law were so egregious as to implicate the Fourteenth Amendment's guarantee of due process" by rendering the trial "fundamentally unfair." *Evans v. Fischer*, 712 F.3d 125, 133, 135 (2d Cir. 2013). Even in those egregious circumstances, the state court ruling may still be found harmless unless it had a "substantial and injurious effect or influence" on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).

Chander does not come close to meeting this standard. To begin with, he has not established that the admission of the 911 calls violated New York's evidentiary rules. Under New York law, the "[a]dmissibility of recorded conversation[s] requires

proof of the accuracy or authenticity of the recording by clear and convincing evidence." *People v. Lotin*, 130 N.Y.S. 741, 741 (App. Div. 2020).  Authenticity may be established through "[t]estimony of a participant in the conversation that it is a complete and accurate reproduction of the conversation and has not been altered." *People v. Ely*, 68 N.Y.2d 520, 527 (1986). Here, Ms. Shandal testified that the recordings accurately and fairly depicted her phone calls.  Parveen 364:10-13 (confirming that the recordings were "complete and accurate reproductions").

The prosecution did acknowledge that Ms. Shandal's phone number was redacted for privacy.  *Id.* at 363:21-364:1 (ADA Coughlin stated that "I think I did take the phone number out, so in that respect [the recordings] might be altered.").  But Petitioner has cited no authority for the proposition that these minor adjustments rendered the recordings inadmissible.

And even assuming, for the sake of argument, that the admission of the 911 calls did violate New York evidentiary law, Chander points to no authority suggesting that such an error would be "so egregious as to implicate the Fourteenth Amendment's guarantee of due process," *Evans*, 712 F.3d at 133, or that the error had a substantial influence on the jury's verdict.  *Brecht*, 507 U.S. at 623.  In the end, the 911 calls played a fairly minor role in the State's proof; much more important was the cascade of physical and testimonial evidence.

*See Ball v. Stevenson*, No. 19-CV-5310, 2021 WL 76835, at *9
(E.D.N.Y. Jan. 8, 2021) (denying federal habeas petition despite
possible violation of state evidentiary rules where the evidence
of the petitioner's guilt was "overwhelming").  And Ms. Shandal
testified at length to the events underlying the substance of
her 911 calls, and was cross-examined.  Thus, the admission of
the 911 call recordings presents no basis for habeas relief.

      2.   <u>The Photograph of the Bloody Towels</u>

      Chander also alleges that the trial court should not
have admitted the photograph Fire Marshal Clinton took of the
bloody towels at the Shandals' home, absent the production of
the actual towels in discovery.  At trial, defense counsel moved
for a mistrial or, alternatively, an adverse inference charge on
the grounds that this failure denied him the opportunity to
argue that the substance on the towels was not "human blood."
Trial Tr. 470:1-6, 396:15-20, 397:14-19.  Justice Modica denied
the motion, stating that the towels "were never in the custody"
of law enforcement and that the government had no "obligation to
gather evidence for the defendant."  *Id.* at 469:11-21.

      New York state law supports Justice Modica's
conclusions.  Law enforcement officers have no "affirmative duty
. . . to obtain potentially exculpatory evidence for the benefit
of a criminal defendant."  *People v. Hayes*, 17 N.Y.3d 46, 51-52
(2011); *see also People v. Banks*, 768 N.Y.S.2d 467, 467 (App.

Div. 2003) (declining to give adverse-inference instruction regarding destruction of videotape because the tape was never in the possession of the police or prosecution).  Here, the record reveals no reason that the fire marshal should have intuited — during the investigation of a crime still in progress — the alleged exculpatory value of the physical evidence (as distinct from the photo).  Thus, the admission of the photograph (and the refusal to give an adverse inference instruction) did not violate Chander's due process rights.

**E.   *Brady* Claim**

Chander argues, as he did on direct appeal, that the State violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to produce a video recording that the State claimed it would produce in a letter dated March 10, 2010.  That letter, which the State submitted in response to an omnibus motion Chander filed, stated that the "People intend to offer at trial a video-recorded statement made by the defendant to PO Seeger on September 15, 2009, at approximately 22:30 PM, at Elmhurst General Hospital," which purportedly showed Chander consenting to take a blood-alcohol test.  Pet. 57.  The State never produced the recording.

On direct appeal, the Appellate Division denied Chander's *Brady* claim on the merits.  Thus, I apply the deferential standard set out in AEDPA (as described above).

Under *Brady*, the prosecution has a constitutional obligation to disclose exculpatory evidence that "is material either to guilt or to punishment." *Brady*, 373 U.S. at 87.  This obligation "covers not only exculpatory material, but also information that could be used to impeach a key government witness." *See United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001)).  Exculpatory evidence is considered "material" only when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Applying this standard, Chander's claim lacks merit. "[T]o establish a *Brady* violation, a petitioner must initially establish that the evidence sought, in fact, existed." *Mannino v. Graham*, No. 06-CV-6371, 2009 WL 2058791, at *9 (E.D.N.Y. July 15, 2009).  The "mere speculation that exculpatory evidence was withheld is insufficient to warrant habeas relief." *Mallet v. Miller*, 432 F. Supp. 2d 366, 377 (S.D.N.Y. 2006).  Chander has not established that the video in question ever existed. Indeed, the State later advised that its pretrial letter informing the Defense that it intended to introduce a video recording of Chander consenting to the blood drawing was "completely in error because at Elmhurst General Hospital they don't allow videotaping . . . ."  Proceeding Tr. dated Oct. 23, 2012, at 39:5-7, ECF No. 12-1.  Even assuming the evidence did

exist as Chander suggested, it is unclear why it would be
exculpatory.[10]   Chander took a blood test that revealed his blood
alcohol content was nearly twice the legal limit.   Zaug 250:12-
14; Seeger 167:4-5, 170:15-17.   Thus, the Appellate Division's
denial of Chander's *Brady* claim was not "contrary to" or an
"unreasonable application of" Supreme Court precedent.

## F.   Fourth Amendment Claim

Chander next argues that the items seized from his car
— the bottle of liquor, tire iron, and bottle that smelled of
gasoline — should have been suppressed because the search
violated his rights under the Fourth Amendment of the United
States Constitution.   The Appellate Division denied this claim
as meritless.

This claim is not cognizable on federal habeas review.
"[W]here the State has provided an opportunity for full and fair
litigation of a Fourth Amendment claim, a state prisoner may not
be granted federal habeas corpus relief on the ground that
evidence obtained in an unconstitutional search or seizure was
introduced at his trial."   *Stone v Powell*, 428 U.S. 465, 482

---

[10] Indeed, while Chander claims that the video was *Brady* material, "mere
speculation by a defendant that the government has not fulfilled its
obligations under *Brady v. Maryland*, is not enough to establish that the
government has, in fact, failed to honor its discovery obligations."
*Halloran v. United States*, No. 13-CR-297, 2020 WL 589410, at *3 (S.D.N.Y.
Feb. 6, 2020).   "[M]ere speculation" that missing materials "might include
exculpatory evidence is not enough to sustain a *Brady* claim."   *James v.
Doldo*, No. 20-CV-280, 2022 WL 3030388, at *4 n.2 (E.D.N.Y. Aug. 1, 2022).

(1976).  The only exception to this rule is where "the state . . . provided no corrective procedures at all to redress the alleged fourth amendment violations" or (2) where "the state . . . provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992).

That was not the case here — to the contrary, Chander raised this very argument at a pretrial suppression hearing at which two police officers testified:  Officer Christopher Seeger, who took Chander's blood sample at the hospital on the day of his crime spree, and Officer Nunez, who responded to the scene and later performed an inventory search of the rental car. Defense counsel cross-examined both witnesses.  Justice Modica denied the motion, finding that that the police recovered the items in question items "pursuant to a valid inventory search." Suppression Hearing Tr. dated Aug. 3, 2011, at 86:4-10, ECF No. 12-1.  The trial court later reopened the suppression hearing to take additional evidence as well.  Hearing Tr. dated Aug. 16, 2012, at 41:23-24, ECF No. 12-1 (Justice Modica indicating that the suppression hearing was reopened).  The State offered, and Chander availed himself of, robust measures to litigate his Fourth Amendment claim.  Moreover, Chander does not argue, let

alone demonstrate, that an "unconscionable breakdown" occurred. Chander's Fourth Amendment claim is denied.

## G.    Speedy-Trial Claim

Chander argues that the delay between his arrest in September 2009 and the start of trial in October 2012 violated his Sixth Amendment right to a speedy trial.  Before trial, Chander moved under CPL Section 30.30 to dismiss the complaint on this ground.  Justice Modica denied the motion in a short-form order; he also noted that he would issue a more comprehensive order at a later date.  Hearing Tr. dated Oct. 18, 2012, at 4:3-25, ECF No. 12-1.  In December 2012, Justice Modica issued a written decision denying the motion after finding only thirty-seven days of delay attributable to the State.  Order dated December 14, 2012, at 17, ECF No. 31-2.  Chander then pressed the Section 30.30 argument on direct appeal.  The Appellate Division denied the claim based on "the defendant's failure to provide a sufficient record for such review." *Chander*, 140 A.D.3d at 1183; *see also People v. Chander*, No. 2013-02903 (App. Div. Nov. 6, 2017) (denying Chander's motion to reargue this issue).

This claim is exhausted, even though Chander's brief to the Appellate Division relied exclusively on state law.  It may be "well settled that a petitioner who raises only a statutory speedy trial claim pursuant to [CPL Section] 30.30 has

not invoked the federal constitution and therefore has not exhausted a federal claim." *Delvalle v. Sabourin*, No. 00-CV-3302, 2002 WL 1000968, at *3 (S.D.N.Y. May 16, 2002). But here, the Appellate Division construed Chander's brief as asserting claims under *both* Section 30.30 and Section 30.20. 140 A.D.3d at 1183 (characterizing Chander's claim as asserting "his constitutional and statutory right to a speedy trial" under CPL Sections 30.20 and 30.30). And "Section 30.20 embodies the federal constitutional speedy trial right." *Parrish v. Lee*, No. 10-CV-8708, 2015 WL 7302762, at *12 (S.D.N.Y. Nov. 18, 2015) (raising Section 30.20 claim in state court "can exhaust a federal constitutional speedy trial claim"). Because the Appellate Division construed this claim as arising under Section 30.20 — and because Chander did then invoke that section expressly to the Court of Appeals, *see* Chander's Supplemental Letter to New York Court of Appeals dated July 28, 2016, at SR 262, ECF No. 12 — Chander's federal speedy-trial claim was "fairly presented" for exhaustion purposes. *Daye*, 696 F.2d at 192 (presentation requirement is satisfied if the claim made in state court was the "substantial equivalent" of the habeas claim).

Although Chander's speedy-trial claim is exhausted, it is procedurally barred here because the Appellate Division denied it on an adequate and independent state ground — namely,

because the record Chander produced on appeal was insufficient to permit review.  *See Chander*, 140 A.D. 3d at 1183; *see also, e.g.*, *Vaughn v. Giambruno*, No. 03-CV-5403, 2005 WL 1995391, at *5 (S.D.N.Y. Aug. 19, 2005) (finding speedy-trial claim procedurally barred on federal habeas review where state court had held petitioner "failed to provide a record sufficient for review" of the claim); *Panezo v. Portuondo*, No. 02-CV-1522, 2003 WL 23198781, at *16 (E.D.N.Y. Nov. 6, 2003); *see also Andrade v. Heath*, No. 11-CV-1086, 2012 WL 3848397, at *8 (S.D.N.Y. Aug. 20, 2012) (barring *Brady* claim on federal habeas review where state appellate division concluded that the "petitioner did not provide the appellate court with a sufficient record").

Again, Chander cannot bypass this default.  Even assuming that the Appellate Division's page-limit rule constituted good cause for the default, Chander has not established prejudice because he has not shown that the claim has merit.  In deciding speedy-trial claims under the Sixth Amendment, courts consider: "(1) the length of the delay; (2) the reasons for the delay; (3) whether the defendant asserted his right in the run-up to trial; and (4) whether the defendant was prejudiced by the failure to bring the case to trial more quickly."  *United States v. Cain*, 671 F.3d 271, 296 (2d Cir. 2012).

Weighing these factors, Chander's speedy-trial claim cannot succeed.  A total of 1,056 days elapsed between Chander's arrest on September 15, 2009 and the onset of trial on October 23, 2012 (when voir dire began).  Chander has not shown that the length of this delay violates the Sixth Amendment as announced in clearly established law as determined by the Supreme Court. *See, e.g.*, *Barker v. Wingo*, 407 U.S. 514, 535-36 (1972) (no speedy-trial violation where more than five years elapsed between arrest and trial).  And most of this delay was not attributable to the government.  Indeed, the State represented that it was trial ready in May 2010 — less than one year after Chander was arrested.  Hearing Tr. dated Aug. 16, 2012, at 12:7-14, ECF No. 12-1 (the State represented that it declared trial readiness on May 19, 2010, and defense counsel "concede[d]" that the following two months of delay were not chargeable to the State).  Chander took several actions that necessarily delayed the proceedings, both before and after the State's declaration: he replaced his trial lawyer several times; sought a mental-competence examination; attempted to negotiate a plea agreement; filed an omnibus motion; moved to suppress evidence; and sat for a hearing in a related criminal proceeding (which alleged that Chander's September 2009 arrest violated the terms of an earlier plea agreement charging assault against Chander's wife).  Thus, this claim lacks merit.

### III. Chander's Correspondence

Following oral argument in this Court on July 29,
2021, Chander submitted a letter to the Court requesting an
evidentiary hearing on the "numerous & complex issues . . . in
[his Petition]."  Letter dated August 13, 2021, at 1, ECF No.
27.  The letter also requested a subpoena to the New York State
courts to produce 300 pages of "missing transcript[s}" that
Chander claims support his speedy-trial claim.  *Id.*  This
request is denied because Chander has not established the
materiality of these transcript pages to his speedy-trial claim.
*See Night Hawk Ltd. v. Briarpatch Ltd., LP*, 03-CV-1382, 2003 WL
23018833, at *8 (S.D.N.Y. Dec. 23, 2003) ("The party issuing the
subpoena must demonstrate that the information sought is
relevant and material to the allegations and claims at issue in
the proceedings.").  In any event, I have already denied
Chander's speedy-trial claim as procedurally barred and
meritless.

Chander's letter also states that "five" documents are
"not appropriately established" on the docket because they are
"missing . . . text numbers" on the docket sheet.  Letter dated
August 13, 2021, at 2, ECF No. 27.  But these docket entries are
not defective.  The five docket entries Chander identifies are
so-called "docket orders," which are orders the Court files
directly on the public docket without a separate document (or

docket number) accompanying them.  *Id.*  They are court orders all the same.

Lastly, Chander's letter contends that "there are [five] missing documents which were filed by me."  *Id.*  But Chander does not identify what these documents are; accordingly, no relief can be contemplated on this basis.

## IV.    Conclusion

For the reasons stated above, Chander's petition for a writ of habeas corpus is denied.  I also deny Chander's request for an evidentiary hearing and the issuance of a subpoena to the New York State courts.  Because Chander has not made a "substantial showing of the denial of a constitutional right," no certificate of appealability will issue here.  28 U.S.C. § 2253.  I certify pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and *in forma pauperis* status is therefore denied for purposes of appeal.  *Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).  Chander has,

however, a right to seek a certificate of appealability from the

Court of Appeals.   *See* 28 U.S.C. § 2253(c)(1).

SO ORDERED.


   /s/ Eric Komitee
ERIC KOMITEE
United States District Judge


Dated:     August 16, 2022
           Brooklyn, New York